UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| VALERIE A. WILSON )<br>(Social Security No. XXX-XX-7899), )<br>     )<br>              Plaintiff, )<br>     )<br>      v.           )<br>     )<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>     )<br>              Defendant. ) | 3:09-cv-76-WGH-RLY |

**MEMORANDUM DECISION AND ORDER**

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, upon the Consents filed by the parties (Docket Nos. 10, 18) and an Order of Reference entered by Chief Judge Richard L. Young on September 23, 2009 (Docket No. 19).

**I. Statement of the Case**

Plaintiff, Valerie A. Wilson, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Supplemental Security Income ("SSI") benefits under the Social Security Act ("the Act"). 42 U.S.C. § 1381(a); 20 C.F.R. § 404.1520(f). The court has jurisdiction over this action pursuant to 42 U.S.C. § 1383(c)(3).

Plaintiff applied for SSI on July 27, 2005, alleging disability since September 15, 2002. (R. 187-90).[1] The agency denied Plaintiff's application both initially and on reconsideration. (R. 164-69, 171-74). Plaintiff appeared and testified at a hearing before Administrative Law Judge Augusta C. Martin ("ALJ") on August 11, 2008. (R. 70-102). Plaintiff was represented by an attorney; also testifying was a vocational expert. (R. 70). On November 7, 2008, the ALJ issued his opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 10-16). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 1-4). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on June 15, 2009, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Plaintiff was 36 years old at the time of the ALJ's decision and had a high school equivalent education. (R. 15). Plaintiff had no past relevant work that qualified as substantial gainful activity. (R. 97).

---

[1] Plaintiff filed a prior application for SSI benefits. (*See* R. 10). That application came on July 17, 2003, and her request was denied initially, upon reconsideration, and on May 17, 2005, after a hearing before an ALJ. (R. 10). After Plaintiff's request for review by the Appeals Council was denied, Plaintiff took no further action; the decision of the ALJ is, therefore, *res judicata* pursuant to 20 C.F.R. § 416.1457. Based on the prior decision, the earliest Plaintiff would be eligible for SSI benefits is May 17, 2005.

B.  **Medical Evidence**

1.  **Plaintiff's Impairments**

Plaintiff was hospitalized on August 16-17, 2005, for nausea and vomiting. (R. 318-24). Plaintiff's medical history included insulin dependent diabetes, diabetic neuropathy, diabetic nephropathy, resting tachycardia, and chronic depression. (R. 318). Plaintiff was diagnosed with vomiting without dehydration and without ketosis (elevated levels of keytone bodies in the blood). (R. 319). Plaintiff was hospitalized again on August 22, 2005, with nausea and vomiting and was diagnosed with ketosis. (R. 325-38).

A November 15, 2005 letter from Plaintiff's optometrist, Tina M. Funk, O.D., revealed that Plaintiff had vision of 20/25 and 20/50 and no retinopathy. (R. 364). However, in November 2006 and May and November 2007, the presence of retinopathy was confirmed by Dr. Funk. (R. 730-733).

Plaintiff was again hospitalized with vomiting on January 1, 2006. (R. 365-87). It was noted that Plaintiff was caught throwing away her nortriptyline, which is a medication used for diabetic neuropathy. (R. 367). Plaintiff was noted to have diabetic neuropathy in both legs. (R. 371). The record on this hospital visit also indicates that Plaintiff had not taken her insulin on the day of the hospital visit. (R. 374). The impression was ketoacidosis. (R. 375).

On March 9-13, 2007, Plaintiff was again hospitalized with vomiting, nausea, and diarrhea. (R. 480-531). She had ulcers on her right and left ankles and a wound on her toe. (R. 487). There was no edema. (R. 487). Plaintiff also

had decreased sensation in her feet and upper extremities, as well as decreased vision. (R. 488). She was diagnosed with ketosis. (R. 494).

On July 15-17, 2007, Plaintiff was admitted to the Lawrence County Hospital with occasional nausea and vomiting. (R. 538-63). Plaintiff reported decreased sensation in her feet and hands and decreased vision. (R. 540). She was diagnosed with ketosis. (R. 542). Again on July 19, 2007, Plaintiff was hospitalized with nausea and vomiting. (R. 578-84).

On October 18, 2007, Plaintiff was hospitalized with vomiting, nausea, and elevated blood sugar levels. (R. 564-77). Plaintiff reported numbness in her hands and feet and decreased vision. (R. 571).

Plaintiff was admitted to the Lawrence County Hospital again on November 23-29, 2007, with complaints of diarrhea. (R. 585-677). Plaintiff had not been taking her insulin or other medications for the prior two days. (R. 587). She was diagnosed with ketoacidosis, gastritis, a gastroesophageal tear, esophagitis, and multiple erosions of the esophagus. (R. 591). She underwent an endoscopy and colonoscopy. (R. 600).

Again on November 30, 2007, Plaintiff was hospitalized with persistent nausea and vomiting, along with uncontrolled blood sugar levels. (R. 678-96). She was transported to the Carle Foundation Hospital and was discharged in stable condition on December 4, 2007. (R. 690).

Plaintiff was hospitalized on May 22-26, 2008, with vomiting. (R. 770-75). It was noted that Plaintiff did not take her insulin. (R. 770).

On May 28-June 2, 2008, Plaintiff was hospitalized with complaints of vomiting. (R. 764-69). It was noted that Plaintiff had not taken her insulin and was also not taking her other medications. (R. 764).

Plaintiff was again admitted to the Lawrence County Memorial Hospital on July 25-27, 2008, with multiple episodes of vomiting and hyperglycemia. (R. 759-63). She had no edema, but there were decreased pulses in her feet. (R. 759).

Plaintiff was hospitalized on August 10, 2008, with abdominal pain and vomiting. (R. 743-44). It was noted that Plaintiff had a history of poor diabetic control, as well as a history of ketoacidosis. (R. 743). Plaintiff was discharged in stable condition after it was determined that her pH levels were within normal limits and her blood sugars were only moderately elevated. (R. 744).

On August 21, 2008, Plaintiff was hospitalized with nausea, vomiting, and diarrhea. (R. 747-50). The records indicate that Plaintiff refused medications at times during her hospital stay. (R. 748). An endoscopy indicated that Plaintiff's gastroesophageal tear from the previous year had improved. (R. 749). Plaintiff was discharged on August 26. (R. 749).

On August 22, 2008, Plaintiff's attorney submitted to the ALJ an unsigned document that appears to be the transcript of a conversation with Plaintiff's treating physician, Steven Ramsaran, M.D. (R. 738-42). Dr. Ramsaran agreed that Plaintiff had diabetes and "a bunch of things that are being caused by the diabetes." (R. 739). He also agreed that vomiting had caused problems with

Plaintiff's gastrointestinal tract. (R. 739). He said that Plaintiff had developed gastritis and esophageal erosions and ulcerations, and he agreed that she had been hospitalized six or seven times for diabetic ketoacidosis in 2007. (R. 739). Dr. Ramsaran opined that Plaintiff's peripheral neuropathy was getting worse and that, over the past year, Plaintiff had been treated for the condition by a neurologist, who had increased her dosage of nortriptyline. (R. 740). Dr. Ramsaran had noticed that Plaintiff's hands and feet were cool, with decreased pulse in her feet, indicating circulation problems. (R. 740). He said that decreased circulation could lead to "easy fatigability" and decreased dexterity. (R. 741). He also agreed that Plaintiff would need to monitor her blood sugar carefully, not allowing it to get too high or too low. (R. 741). He opined that she would miss "several days" per month because she had recently had multiple episodes of vomiting. (R. 741). Regarding problems with vision due to retinopathy, Dr. Ramsaran stated, "That would depend on how well she would keep her blood sugars controlled." (R. 742).

On September 4-7, 2008, Plaintiff was hospitalized with nausea and vomiting. (R. 751-54). She was admitted for fear that her ketoacidosis would worsen. (R. 751). An exam revealed no leg edema, but there were decreased pulses in her feet. (R. 752).

### 2. State Agency Review

On October 11, 2005, State agency physician Ernst C. Bone, M.D., reviewed Plaintiff's file and completed a Physical Residual Functional Capacity

Assessment. (R. 339-46). Dr. Bone, acknowledging that Plaintiff experienced periods of neuropathy in her legs and feet, indicated that Plaintiff could lift and/or carry up to 20 pounds occasionally and ten pounds frequently, and that she could stand and/or walk, as well as sit, for about six hours each in an eight-hour workday. (R. 340). He further found that she could occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds, and that she could frequently balance, stoop, kneel, crouch, and crawl. (R. 341). He opined that Plaintiff was limited in her ability to handle, finger, and feel, due to neuropathy, but he also indicated that most of the time she should not have any problem performing these activities. (R. 342). Dr. Bone opined that Plaintiff was not limited visually. (R. 342). He also opined that Plaintiff should avoid concentrated exposure to vibrations and even moderate exposure to such hazards as machinery or heights. (R. 343). On April 3, 2006, C.A. Gotway, M.D., reviewed all of the evidence in Plaintiff's file and affirmed the opinion of Dr. Bone. (R. 477-78).

### III. Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material

conflicts, make independent findings of fact, and decide questions of credibility. *Richardson,* 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner. *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that she suffers from a "disability" as defined by the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during

steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

### V.  The ALJ's Decision

The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 12).  The ALJ continued by finding that, in accordance with 20 C.F.R. § 404.1520, Plaintiff had three impairments that are classified as severe:  (1) diabetes; (2) diabetic neuropathy; and (3) kidney disease.  (R. 12).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 13).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 14).  Consequently, the ALJ concluded that Plaintiff retained the RFC for light work, except she:  could lift 25 pounds occasionally and 20 pounds frequently; could stand and/or walk for only two hours in an eight-hour workday; could climb, balance, stoop, kneel, crouch, or crawl occasionally; could occasionally feel with her hands; has limited vision field and sensitivity primarily in her left eye and needs to wear glasses/contact lenses; and needs to avoid concentrated exposure to extremities of temperature, vibrations, or hazardous conditions such as heights or moving machinery.  (R. 13).  The ALJ opined that Plaintiff could not perform any past relevant work.  (R. 15).  However, Plaintiff retained the RFC to

perform a significant number of jobs in the regional economy. (R. 15). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 16).

## VI. Issues

The court has examined Plaintiff's brief and concludes that Plaintiff has essentially raised two issues. The issues are as follows:

1. Whether the ALJ failed to give proper weight to various medical opinions.

2. Whether the ALJ failed to take into consideration the side effects of medication.

**Issue 1:    Whether the ALJ failed to give proper weight to various medical opinions.**

Plaintiff's first argument is that the ALJ failed to give controlling weight to the opinions of her treating physician, Dr. Ramsaran, and relied too heavily on the opinions of the State agency doctors. Opinions of a treating physician are generally entitled to controlling weight. *Clifford v. Apfel,* 227 F.3d at 870. However, an ALJ may reject the opinion of a treating physician if it is based on a claimant's exaggerated subjective allegations, is internally inconsistent, or is inconsistent with other medical evidence in the record. *Dixon v. Massanari,* 270 F.3d 1171, 1177-78 (7th Cir. 2001). Additionally, 20 C.F.R. § 404.1527 provides guidance for how the opinions of treating and nontreating sources are to be evaluated and explains as follows:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) *Examining relationship.* Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain. When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability

> programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.
>
> \*\*\*\*\*
>
> (f) *Opinions of nonexamining sources.* We consider all evidence from nonexamining sources to be opinion evidence. When we consider the opinions of nonexamining sources, we apply the rules in paragraphs (a) through (e) of this section. In addition, the following rules apply to State agency medical and psychological consultants, other program physicians and psychologists, and medical experts we consult in connection with administrative law judge hearings and Appeals Council review:
>
> (1) In claims adjudicated by the State agency, a State agency medical or psychological consultant (or a medical or psychological expert (as defined in § 405.5 of this chapter) in claims adjudicated under the procedures in part 405 of this chapter) will consider the evidence in your case record and make findings of fact about the medical issues, including, but not limited to, the existence and severity of your impairment(s), the existence and severity of your symptoms, whether your impairment(s) meets or equals the requirements for any impairment listed in appendix 1 to this subpart, and your residual functional capacity. These administrative findings of fact are based on the evidence in your case record but are not themselves evidence at these steps.

20 C.F.R. § 404.1527.

In this case, Dr. Ramsaran opined that Plaintiff's decreased circulation could lead to "easy fatigability" and decreased dexterity. (R. 741). He also agreed that Plaintiff would need to monitor her blood sugar carefully, not allowing it to get too high or too low. (R. 741). He opined that she would miss "several days" per month because she had recently had multiple episodes of

vomiting. (R. 741). Dr. Ramsaran also opined that Plaintiff's vision problems would be impacted if she were unable to keep her blood sugar levels controlled. (R. 742). The ALJ discussed this opinion evidence as follows:

> The undersigned does not give significant weight to Dr. Ramsaran's report as it is largely speculative going into what could happen if the claimant did not control her blood sugar. If the claimant is medically compliant, her blood sugars should be controlled and she would not have the difficulties suggested during the interview.
>
> Since January 2005 the claimant was hospitalized [on] 11 occasions, primarily because of nausea and vomiting with diabetic ketoacidosis (Exhibit B8F[,] B1OF, B12F, B21F, B24F, B26F, B28F and B34F). However, the claimant was not always compliant in regard to her medication.

(R. 14). The ALJ's determinations that Dr. Ramsaran's opinions were too speculative and that Plaintiff was noncompliant in taking her medications are supported by an examination of the record. Dr. Ramsaran's opinions were based on what Plaintiff's condition would be if she is unable to keep her blood sugars under control. And, the ALJ correctly indicated that Plaintiff was not always compliant with her insulin or other medications. The court has examined the medical evidence and discovered at least four instances of Plaintiff's noncompliance: January 2006 (R. 367, 374), November 2007 (R. 587), May 22, 2008 (R. 770), and May 28, 2008 (R. 764). Due to the speculative nature of Dr. Ramsaran's opinions and Plaintiff's noncompliance, the ALJ's decision to decline to give controlling weight to Dr. Ramsaran's opinions is supported by substantial evidence. Plaintiff also found fault in the ALJ's reliance on the opinions of State agency physicians. However, Plaintiff has failed to point to any objective medical

evidence in the record which contradicts the limitations set forth by the State agency physicians. Consequently, the opinions of the ALJ are affirmed.

**Issue 2:     Whether the ALJ failed to take into consideration the side effects of medication.**

Plaintiff's second claim is that the ALJ failed to consider whether Plaintiff's medications caused side effects that affected her RFC. Plaintiff argues that she testified at her administrative hearing that she felt dizzy and tired as a result of her medications, and the ALJ did not take this into consideration in formulating plaintiff's RFC. The regulations do require the ALJ to consider various factors in determining whether or not Plaintiff is disabled, including the side effects of medication. 20 C.F.R. § 404.1529(c)(3). In this case, the ALJ does state that he considered all factors listed in § 404.1529. (R. 13). After assessing all of Plaintiff's impairments, the ALJ provided a very limited RFC for someone who was only in their 30s. He limited Plaintiff to only standing/walking two hours in an eight-hour workday, and he limited her to no exposure to hazards. Plaintiff has not pointed to any medical opinion that provided more substantial limitations than those provided by the ALJ. Absent any substantial medical evidence providing greater limitations, the ALJ's RFC assessment adequately provided for her complaints of fatigue by limiting her to only two hours of standing/walking and adequately provided for her alleged dizziness by avoiding exposure to hazards.

## VII. Conclusion

The Commissioner's decision is supported by substantial evidence. The final decision of the Commissioner is, therefore, **AFFIRMED.**

**SO ORDERED** the 29th day of March, 2010.

                                                William G. Hussmann, Jr.
                                                United States Magistrate Judge
                                                Southern District of Indiana

**Electronic copies to:**

John Ryan Worman
WOODS & WOODS, LLP
jworman@woodslawyers.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov